**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DECISION ECONOMICS, INC.,<br><br>                         Plaintiff,<br><br>    v.<br><br>JOHN J. BLANK,<br><br>                       Defendant. | Civil Action No. |

## COMPLAINT AND JURY DEMAND

Decision Economics, Inc. ("DE") brings this action against John J. Blank ("Blank") for his intentional and unlawful access of DE's protected computer, and his theft, disclosure and unlawful retention of DE's confidential and proprietary information and trade secrets.

## NATURE OF THE ACTION

DE is a global economic and financial market information and advisory firm that provides macroeconomic research and analysis to help investment professionals position themselves in the financial markets.  DE employed Blank in its Boston office as a Senior Vice President, Senior Industry Strategist, from mid-October 2008 until June 23, 2010, when it terminated his employment.  From the outset of his employment, Blank was aware of the importance DE placed on maintaining its confidential and proprietary information and trade secrets.  As a condition of employment, Blank signed a Confidentiality and Inventions Agreement, in which he promised, among other things, to keep in confidence and trust DE's client information and other confidential and proprietary information and trade secrets, to protect all such property from disclosure, and to return it upon termination of his employment. DE recently learned that Blank gained access to DE's protected computers <u>after</u> his employment

was terminated, and he obtained a volume of documents containing DE's trade secrets and confidential and proprietary information.  Among other things, Blank's actions violated the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030; constitutes a statutory and common law theft of DE's trade secrets, breach of contract, and conversion; and has caused and will cause immeasurable loss and damage to DE.  Since DE's recent discovery of Blank's actions, it has made repeated demands to Blank to return the documents and comply with his obligations to DE.  Blank refused to return DE's trade secrets, confidential and proprietary information, and other property, and he now has made unauthorized use and disclosures of this information.  DE brings this action against for preliminary and permanent injunctive or other equitable relief to prevent Blank from continuing to cause irreparable harm to DE, and for damages to redress injuries suffered by DE as a result of his wrongful conduct.

## THE PARTIES

1.      DE is a privately held corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business at One Boston Place, Boston, Massachusetts.

2.      Blank is an individual who, upon information and belief, resides at 4055 Redwood Avenue #222, Marina Del Ray, Los Angeles County, California.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1030(g) and 28 U.S.C. §§ 1331, 1332, and 1367.

4.      This Court has personal jurisdiction over Blank because Blank unlawfully accessed and misappropriated DE's confidential and proprietary information and trade secrets from a protected computer in DE's Boston office.

5.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS COMMON TO CALL COUNTS

### DE's Business and Its Clients

6.      DE employs a staff of research economists, led by Dr. Allen Sinai, DE's Co-Founder and Chief Global Economist and Strategist ("Dr. Sinai").  DE's economists collaboratively perform comprehensive research, monitoring, analyses, interpretation, and forecasts ("research and analysis") of the fundamental factors, policies and events that impact economies of the United States and over 45 countries worldwide, and fixed income, equity and currency markets and other asset classes.

7.      DE's macroeconomic research and analysis manifests in services and products offered to its clients, providing DE's views, forecasts and insights on evolving market trends and investment strategies.

8.      DE has clients in many of the United States and around the world, including financial institutions, brokerage firms, corporations, government agencies, private clients, foundations, endowments, and pension funds; a number require DE to keep confidential the fact of the relationship.

9.      At all relevant times, DE routinely communicated with many or all of its clients by electronic mail ("email"), including by way of the computer Blank regularly used as a DE employee.

10.     DE has spent a considerable amount of resources in developing its clients.  DE does not publish or make publicly available its client information, including but not limited to client identities or the identities of their end-customers, internal client information, contact information, requirements, preferences, and prospects.

11.     Among the products and services DE offers to its clients are no fewer than thirteen subscription-based proprietary publications.

12.     The cost of a subscription to any of DE's proprietary publications is in excess of $5,000.00 in any one-year period.

13.     DE also offers its clients a Global Asset Allocation consultation service, which uses proprietary information systems and toolsets, including the advanced econometric modeling capabilities found in the Sinai-Boston Model and the Decision Economics Sector Industry Model, to connect the macroeconomy to industry and sector asset allocations, and provide economic- and policy- driven proprietary investment weightings by global region, country, asset class and economic sector.

14.     The cost of a subscription to the Global Asset Allocation service is in excess of $5,000.00 in any one-year period.

15.     Sinai-Boston (SB) Model is based on highly technical trade secret equations that have been developed from over four decades of research by Dr. Sinai, to reliably forecast and simulate the impact of economic variables on the behavior of the macroeconomy -- aggregate demand, aggregate supply, production and productivity, incomes and jobs, profits, interest rates, the stock market, exchange rates, expectations formation, foreign trade, the current account, and aspects of rest-of-the world economic behavior.  The Decision Economics Sector Industry Model builds on the Sinai-Boston (SB) Model, and also is based on highly technical trade secret equations that have been developed since DE was founded in 1996, to reliably forecast and simulate the effects of the economy on the S&P 500 industries and sectors.

16.     DE maintains unpublished, detailed historical compilations of its asset allocations, methodology, and comparative data, by country, region, asset class and economic

sector, reflecting the timeliness, accuracy and value of the DE research and analysis throughout market cycles.  DE derives independent economic value from not making its historical compilations generally known or available to the public or to other persons who can obtain economic value from their disclosure.

### DE Protects Its Confidential And Proprietary Information And Trade Secrets

17.    DE takes reasonable measures to protect its confidential and proprietary information and trade secrets.

18.    DE requires that all employees, including Dr. Sinai, agree to and abide by confidentiality and inventions agreements as a condition of employment; and it further restricts post-employment client contact through Stock Option Agreements.

19.    DE restricts access to its facilities to its employees and authorized visitors.  DE secures its computer network and email servers behind hardware and software firewalls; requires authenticated login name and password to access its network and computers, and associated files and emails; restricts remote network access to authorized users; and requires that remote access be secured over password protected Secure Sockets Layer/ Transport Layer Security.  DE grants user-specific access rights and privileges, which are promptly disabled when authorized access is terminated, such as upon employment termination.

### Blank's Employment And Obligations To DE

20.    By letter dated September 29, 2008 (the "Offer Letter"), DE extended Blank a written offer of employment as a Senior Vice President, Senior Industry Strategist, in DE's Boston office.

21.    The Offer Letter expressly stated that the employment offer to Blank was conditioned on his signing and abiding by the Confidentiality and Inventions Agreement.

22.     The Offer Letter informed Blank that the Confidentiality and Inventions

Agreement is required of all DE employees, including Dr. Sinai.

23.     Blank accepted the terms of the Offer Letter, and on September 30, 2008, he

signed and returned to DE his Confidentiality and Inventions Agreement (the "Confidentiality

Agreement").

24.     Blank started work at DE on or about October 13, 2008.  Blank did not bring

clients to DE.

25.     The Confidentiality Agreement defines DE's "Proprietary Information" as

including "information that has been created, discovered, or developed, or has otherwise

become known to [DE] (including without limitation information created, discovered,

developed or made known by or to [Blank] during the period of or arising out of [his]

employment by [DE]), and/or in which intellectual property rights have been assigned or

otherwise conveyed to [DE], which information has commercial value in the business in which

[DE] is engaged; and further provides that "[b]y way of illustration, but not limitation,

Proprietary Information includes trade secrets, processes, formulae, data and know-how,

improvements, inventions, techniques, marketing plans, strategies, forecasts and customer lists

and methods of serving [DE's] clients or customers."

26.     Blank acknowledged and agreed that DE is the sole owner of the Proprietary

Information and that the Proprietary Information is confidential, proprietary, and protected from

disclosure.

27.     Blank promised and agreed that, at all times during his employment with DE and

at all times after the termination of that employment, he will keep the Proprietary Information in

confidence and trust; and he will not disclose or any Proprietary Information without DE's

written consent, except as was necessary in the ordinary course of performing his duties as a DE employee.

28.     Blank promised and agreed that upon termination of his employment for any reason, he would return to DE and not keep or take with him any Proprietary Information or DE property pertaining to Proprietary Information, or any reproduction.

29.     Blank promised and agreed that he will promptly return to DE any and all Proprietary Information or DE property pertaining to Proprietary Information, or any reproduction, as and when requested by DE.

30.     Blank acknowledged and agreed that his obligations under the Confidentiality Agreement survived the termination of his employment for any reason.

31.     As a DE employee and by virtue of his position as Senior Vice President, Senior Industry Strategist, Blank was privy to DE's Proprietary Information, including but not limited to its proprietary publications and confidential and trade secret client information, historical data, and equations.

32.     Blank accepted a grant of DE stock options and signed a Stock Option Agreement on December 23, 2008 (the "Stock Option Agreement"); in doing so he promised that for a period of two years following the termination of his employment with DE, he will not directly or indirectly solicit or accept, or request, induce or advise any DE client to withdraw, curtail, diminish, terminate or cancel its business with DE.

### Blank Unlawfully Took DE's Confidential And Proprietary Information And Trade Secrets

33.     DE terminated Blank's employment on June 23, 2010.

34.     On June 23, 2010, DE disabled Blank's access rights and privileges to its network, computers and email, and his building access.

35.     On June 23, 1020, <u>after</u> this employment was terminated, Blank was aided by a DE employee to gain unauthorized access to the DE protected computer in the Boston office that Blank had used as a DE employee ("DE's Protected Computer").

36.     Between 2:37 p.m. and 2:50 p.m. on June 23, 2010, Blank accessed DE's Protected Computer and, without or in excess of authorization, attempted to send twenty separate emails, with a combined total of sixty-two documents attached, to his personal email address at the internet service provider Verizon.net.

37.     Fifty-eight of the sixty-two attached documents were DE documents containing DE's Proprietary Information.

38.     None of the twenty emails or sixty-two attachments Blank attempted to send on June 23, 2010, was delivered to Blank's personal email address.

39.     On February 13, 2012, DE discovered that, on June 24, 2010, between 11:37 a.m. and 11:42 a.m. Blank intentionally and without authorization accessed DE's Protected Computer and forwarded (resent) the same twenty emails with the combined total of sixty-two documents attached, to his personal email address at the internet service provider Verizon.net.

40.     Upon information and belief, Blank conspired with a DE employee to access DE's Protected Computer on June 24, 2010, and in doing so, obtained DE's Proprietary Information.

41.     Upon information and belief, the IP address for internet service provider Verizon.net is 206.46.232.10, located in Catskill, NY.

42.     Included in the sixty-two documents (the "Emailed Documents") is a wordprocessing document containing a trade secret compilation of information about DE clients, including but not limited to client identities, internal client information, key contacts,

contact information, client requirements and preferences, and client prospects; an electronic

spreadsheet containing trade secret compilations of data and know-how dating back to 1999, at

least, about DE's asset allocations, methodology, and comparative data, by country, region,

asset class and economic sector; and more than fifty other documents containing DE's

Proprietary Information, including copies of DE proprietary publications covering more than a

one-year period.

**Blank Has Used and Disclosed DE's Proprietary Information**

43.     In early February 2012, in connection with a proceeding in the Massachusetts

Superior Court, Blank failed to disclose that he had taken the Emailed Documents from DE, or

any compilation of client or asset allocation information; on February 20, 2012, Blank admitted

that he took and has in his possession the Emailed Documents sent to his personal Verizon.com

email address on June 24, 2010.

44.     Blank stated that he took the Emailed Documents for "job search" purposes and

used them in connection with his efforts to obtain employment.

45.     Upon information and belief, Blank misappropriated DE's Proprietary

Information with the intent to misrepresent and claim it as his own, unlawfully solicit DE's

clients, and unfairly compete with DE and/or disadvantage DE in the marketplace.

46.     Upon information and belief, Blank made false and misleading statements about

his work and responsibilities at DE with the intent to disguise and justify his misappropriation

and unauthorized possession and use of DE's Proprietary Information.

47.     For instance, in letters to prospective employers, Blank misrepresented that at

DE he had "just put together a global and U.S. asset allocation group, growing it from 6 clients

to 39 clients in 20 months!  In doing this, I have developed a proprietary top-down method for

examining business cycles with sector and industry dynamics, and with valuations embedded."

He also stated, "The work is fresh in my mind, and client interest is already in place."  In

another letter to a prospective employer, Blank stated that he wished to "port" DE's approach to

the prospective employer.

**Blank Has Refused DE's Repeated Demands For The Immediate Return Of Its Property**

48.     Beginning on February 17, 2012, DE made repeated written demands to Blank to

immediately return all of DE's property, including all its Proprietary Information, including all

reproductions or excerpts; and to provide written certifications concerning his compliance with

the Confidentiality Agreement.

49.     Blank assured DE that he "has not and will not use or make any transmission or

disclosure of the information contained in the documents;" but he otherwise repeatedly stalled

and misled DE about his intent to respond to DE's demands.

50.     DE learned that despite Blank's assurances, Blank disclosed the documents

containing DE's Proprietary Information to his attorneys; DE explicitly stated to Blank's

attorneys that they are not authorized to access or review the information in the documents.

51.     DE learned that Blank's attorneys accessed at least at least fifty-two of the

Emailed Documents, including the trade secret compilation of information about DE clients; the

spreadsheet containing trade secret compilations of DE's asset allocations, methodology, and

comparative data; and copies of DE's proprietary publications covering more than a one-year

period.

52.     DE repeated its demands that Blank immediately return all of DE's property,

including all its Proprietary Information, and provide written certification concerning

compliance with the Confidentiality Agreement; and demanded that Blank's attorneys provide

written assurances that they will not further access, or use or disclose DE's Proprietary Information.

53.     Blank and his attorneys have refused to comply with DE's demand to return its property or provide written assurances that they will not further access, use or disclose DE's Proprietary Information; and they have threatened to use or disclose DE's confidential client information.

## COUNT I
### (Violation of Computer Fraud and Abuse Act)

54.     DE repeats and realleges each of the preceding allegations as if set forth herein.

55.     This Count is an action under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, which provides a cause of action, *inter alia*, against anyone who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains… information from any protected computer;" or who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value;" or who "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage" or "causes damage and loss."  The Computer Fraud and Abuse Act also provides that it is a violation to conspire to commit or attempt to commit such offenses.

56.     The computer accessed by Blank without or in excess of authorization was a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(1) and (2).

57.     DE's Protected Computer was used in and affecting interstate and foreign commerce and communication within the meaning of 18 U.S.C. § 1030(e)(2)(B) .

58.     On June 23, 2010, Blank, acting alone or conspiring with another person, intentionally and without authorization or in excess of any authorization, accessed and attempted to obtain information in DE's Protected Computer that he was not authorized to obtain.

59.     On June 24, 2010, Blank acting alone or conspiring with another person, intentionally and without authorization, accessed and obtained information in DE's Protected Computer that he was not authorized to obtain.

60.     Upon information and belief, Blank knowingly and with intent to defraud, accessed DE's Protected Computer without or in excess of authorization, furthering his intended fraud, and obtaining DE's valuable Proprietary Information.

61.     Blank's intentional and unlawful conduct caused DE damage and loss aggregating in excess of $5,000 in a one-year period, including but not limited to the cost of responding to the offense, conducting a damage assessment, many staff hours lost from day-to-day responsibilities; the subscription value of the publications; and other damages incurred.

62.     Absent injunctive relief, including the immediate return to DE of all Proprietary Information, DE will suffer severe and irreparable injury and immeasurable financial damages, as a result of Blank's theft of DE's confidential and proprietary information and trade secrets. Accordingly, preliminary and permanent injunctive relief, enjoining Blank and his agents from retaining the misappropriated information and from using or disclosing the information, is the only remedy that will afford DE meaningful relief.

## COUNT II
### (Misappropriation of Trade Secrets)

63.     DE repeats and realleges each of the preceding allegations as if set forth herein.

64.     This Count is an action under M.G.L. c. 93, §§ 42 and 42A, and common law. M.G.L. c. 93, § 42, provides, *inter alia*, that whoever steals, unlawfully takes, conceals, copies, or by fraud or deception obtains, from any person or corporation, with intent to convert to his own use, a trade secret, regardless of value, shall be liable in tort to said corporation or individual for all damages in an amount up to double those found.  For purposes of the statute, "trade secret" is defined as including, but not limited to, anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement.

65.     DE's trade secrets include but are not limited to information concerning the identities of its past, prospective and current clients and their end-customers, their internal information, contact information, requirements, preferences, and prospects; the formulas and equations in the Sinai-Boston Model and the Decision Economics Sector Industry Model and resulting data; and the compilations of DE's asset allocations, methodology, and comparative data.

66.     DE took reasonable steps to safeguard the secrecy of its trade secrets and confidential and proprietary information.

67.     Blank has a statutory duty not to disclose to third parties any confidential information or trade secrets obtained during the course of his employment, and he has a legal duty not to convert any confidential information or trade secrets of DE to his benefit or the benefit of another.

68.    Blank has stolen, unlawfully taken, copied, concealed, and/or obtained by fraud or deception, DE's trade secrets and confidential and proprietary information, with intent to convert it to its own use and the use of his future employers.

69.    Blank acted in willfully and in bad faith in misappropriating DE's confidential and proprietary information and trade secrets.

70.    As a result of Blank's actions, DE has or will suffer substantial damage and loss in excess of $75,000, exclusive of interest and costs, which amount will be proved at trial.

71.    Blank will, unless enjoined, continue to disclose and/or use DE's confidential and proprietary information and trade secrets.

72.    Absent injunctive relief, including the immediate return to DE of all Proprietary Information, DE will suffer severe and irreparable injury to its goodwill, damage to its reputation, and immeasurable financial damages as a result of Blank's use or disclosure of DE's confidential and proprietary information and trade secrets.  Accordingly, preliminary and permanent injunctive relief, enjoining Blank and his agents from retaining the misappropriated information and from using or disclosing the information, is the only remedy that will afford DE meaningful relief.

## COUNT III
### (Breach of Contract)

73.    DE repeats and realleges each of the preceding allegations as if set forth herein.

74.    The Confidentiality Agreement is a valid and binding agreement.

75.    Under the Confidentiality Agreement, Blank has a lawful obligation, which survived the termination of his employment, not keep or take with him any Proprietary Information or DE property pertaining to Proprietary Information, or any reproduction.

76.     Under the Confidentiality Agreement, Blank has a lawful obligation, which survived the termination of his employment, to promptly return any and all Proprietary Information to DE as and when requested by DE.

77.     Blank has breached and is in breach of his contractual obligations to DE, and as a result, DE has suffered and will suffer substantial damages in an amount to be established at trial.

**COUNT IV**
**(Conversion)**

78.     DE repeats and realleges each of the preceding allegations as if set forth herein.

79.     DE has the right to immediate possession of the Proprietary Information.

80.     Blank is wrongfully and intentionally exercising dominion and control over the Proprietary Information, and has refused to return the property after repeated demand by DE.

81.     As a result of the foregoing, Blank is liable for conversion in an amount to be established at trial.

WHEREFORE, DE requests the Court enter the following relief on all counts of the Complaint, as it deems appropriate:

1.  Declare that Blank improperly and wrongfully obtained information from DE's protected computer;

2.  Enjoin Blank, and his agents and persons who act in concert or participation with him, from deleting or destroying any electronically stored information ("ESI") or information or documents in their possession or control until further order of the Court;

3.  Enjoin Blank, and his agents and persons who act in concert or participation with him, from failing to immediately return to DE all information and documents, emails

and media (such as USB drives, CD or DVD discs, and electronic media) on which

he has, has stored, or to which he has copied DE information;

4.  Enjoin Blank and his agents from retaining, using, or accessing, or disclosing or

transmitting to any other person, any of DE's proprietary or confidential information

or trade secrets;

5.  Declare that Blank has made false statements of fact concerning DE and false and

misleading statements about his work and responsibilities at DE;

6.  Enjoin Blank from contacting or soliciting any clients or potential clients of DE,

including those identified in the confidential or trade secret information he

misappropriated;

7.  Award DE damages due to Blank's having accessed, obtained, used, and/or

disclosed information, including from DE's computers;

8.  Award DE its costs, including attorney's fees, together with interest on any monetary

judgment it may obtain; and

9.  Other such relief at law or equity as the Court may deem just and proper.

DECISION ECONOMICS, INC.,
By Its Attorney,


/s/ Sally L. Adams
Sally L. Adams, MA BBO# 629688
THE LAW OFFICE OF SALLY L. ADAMS
60 Ridgewood Road
Milton, MA  02186
Telephone:     (617) 696-2027
DATED:  April 16, 2012          sally@sallyadamslaw.com